478 So.2d 1240 (1985)
LOUISIANA POWER & LIGHT COMPANY
v.
UNITED GAS PIPE LINE COMPANY and Pennzoil Company.
No. CA-1111.
Court of Appeal of Louisiana, Fourth Circuit.
September 4, 1985.
Rehearing Denied December 20, 1985.
*1241 C. Murphy Moss, Jr., George Frazier, Lemle, Kelleher, Kohlmeyer, Hunley, Moss & Frilot, New Orleans, La., W. DeVier Pierson, David J. Hill, Douglas E. Nordlinger, Timothy S. Buehrer, Scott P. Klurfeld, Pierson Semmes Crolius & Finley, Washington, D.C., for defendant-appellee United Gas Pipe Line Co.
Michael R. Fontham, Wayne J. Lee, Paul L. Zimmering, Stephen G. Bullock, of Stone, Pigman, Walther, Wittmann & Hutchingson, New Orleans, Marshall B. Brinkley, Baton Rouge, for Louisiana Public Service Com'n.
W.T. Tete, of Mars, Medo & Tete, Monroe & Lemann, Andrew P. Carter, Kenneth P. Carter, Terrence G. O'Brien, New Orleans, for plaintiff and appellant Louisiana Power & Light Co.
B. Daryl Bristow, Stephen M. Hackerman, Baker & Botts, Houston, Tex., Gene W. Lafitte, Frederick W. Bradley, Liskow & Lewis, New Orleans, for defendant-appellee Pennzoil Co.
Before GARRISON, BYRNES and ARMSTRONG, JJ.
BYRNES, Judge.
This is an appeal from a judgment of the trial court dismissing the antitrust claims of Louisiana Power and Light Company, (LP & L), against United Gas Pipe Line Company, (United), and Pennzoil Company, (Pennzoil). The judgment also dismissed a revocatory action brought by LP & L against Pennzoil. LP & L's suit was based on allegations that United and Pennzoil had violated the antitrust laws of Louisiana (La.R.S. 51:121 et seq.) by conspiring together to withhold information and manipulate regulatory mechanisms in such a way as to monopolize trade in natural gas, foreclose competition among gas suppliers to power plants, and avoid contracts which obligated United to supply gas to those facilities at an unfavorably low price.
At the close of LP & L's case in chief, United and Pennzoil filed motions to dismiss the entire suit under C.C.P. Art. 1810(B). The trial judge granted the motion *1242 "... only insofar as the antitrust claim and the revocatory action are concerned". He dismissed the action because he believed
... Louisiana Power and Light Company has shown no right to relief for its claim of antitrust violation against defendants United Gas Pipe Line and Pennzoil Company.
Louisiana Power and Light has failed to prove by a preponderance of the evidence the elements necessary to support an antitrust action under Louisiana law.
Unfortunately, the trial judge did not elaborate the findings of fact on which this legal conclusion was based and we must therefore make our own findings, based on our evaluation of the record as tempered by the opinion of the trial judge.
Louisiana's antitrust laws are embodied in La.R.S. 51:122 et seq. Section 122 forbids "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce within this state." Section 123 states that "No person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state." These statutes track the federal antitrust laws embodied in the Sherman Act, 15 U.S. C.A. § 1 et seq.
Both the Louisiana & Federal statutes draw a basic distinction between unilateral and concerted action. RS. 51:122, like Section 1 of the Sherman Act, reaches unreasonable restraints of trade effected by "a contract, combination .. or conspiracy" between two or more separate entities. Unilateral activity is regulated by R.S. 51:123 and Section 2 of the Sherman Act. These statutes address monopolization and attempts to monopolize trade by a single entity as well as combinations or conspiracies to monopolize.
LP & L's briefs to this court seem to limit its claims for antitrust injury, under both R.S. 51:122 & 123, to allegations based on conspiracy. LP & L's original brief outlined its position as follows:
LP & L's complaint against United and Pennzoil is for their violation of the state analogues of both Sherman Sec. 1 and Sec. 2 As applied to the case at hand, the fact of conspiracy is an element in common to their violations under both substantive sections of law.

A firm can be guilty of Sec. 2 by its unilateral conduct, whereas a Sec. 1 violation requires agreement or concerted acts. However, Sec. 2 of the Sherman Act and R.S. 51:123 of the Louisiana statutes, also provide that "[n]o person shall ... combine, or conspire with any other person to monopolize ...

LP & L's complaint is not directed at United's unilateral conduct. Rather, it is directed at that course of conduct wherein Pennzoil combined and conspired with United in inflicting antitrust injury upon LP & L, other power-plants and the electric consumers in Louisiana generally. (emphasis added) (LP & L original brief page 109-110).
Throughout its brief, LP & L seems to emphasize its conspiracy based claims almost to the exclusion of any claim of unilateral action by United or Pennzoil. For example, in discussing the relationship of the Federal and State antitrust statutes LP & L states that:
"... basically the relationship of sec. 122 and 123 of the state statute is the same as sec. 1 and 2 of the federal statute...
The two sections are complementary to each other. The principal difference between the two sections insofar as the federal cases are concerned is that the prohibition against a restraint of trade extends only to conduct by more than one firm, whereas the prohibition against monopolization even extends to the conduct of a single firm. The distinction is not of crucial importance to the case now before the Court because plaintiff is complaining of the conduct of a combination of two firms, Pennzoil and United." (emphasis added) (LP & L original brief page 89) *1243 Apparently, LP & L did not feel that the unilateral action of either company was sufficient to support an antitrust action.
Accordingly, our analysis of this case will first focus on the adequacy of LP & L's proof that United and Pennzoil conspired together to restrain trade or achieve a monopoly. In undertaking this analysis, reference to the Federal jurisprudence relative to antitrust law is both instructive and necessary given the similarity between the Federal and State statutes and the relative scarcity of Louisiana cases dealing with the subject. Parish National Bank v. Lane 397 So.2d 1282 (La.1981) Our analysis is further narrowed by the nature of the relationship between the defendants.
Until 1965, United Gas Pipeline Company was a wholly owned subsidiary of United Gas Corporation and was not affiliated in any way with Pennzoil. In December 1965, Pennzoil acquired 42% of the common stock of United Gas Corporation, giving it effective control of that corporation as well as its wholly owned subsidiary United Gas Pipeline Company. In April 1968, Pennzoil and United Gas Corporation merged. United Gas Pipeline Company was then operated as a wholly owned subsidiary of the newly formed Pennzoil-United Corporation, which later changed its name to Pennzoil Company. In March 1974, Pennzoil and United Gas Corporation ceased to be affiliated.
Both the Louisiana statutes and the Federal statutes from which they are derived, require concerted action by two or more separate entities to establish a combination or conspiracy to restrain or monopolize trade. The question of whether the coordinated actions of a parent and its corporate subsidiary can constitute this plurality of actors troubled courts for many years and produced an inconsistent and confusing line of cases.[1]
However, the United States Supreme Court has recently resolved the question, at least as to wholly owned subsidiaries. In Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the court held that a parent and its wholly owned subsidiary are incapable of conspiring with one another as a matter of law for purposes of Section 1 of the Sherman Act (the federal counterpart of R.S. 51:122). Left unresolved was the question of when, if ever, a parent and its partially owned subsidiary could conspire together.
The ruling in Copperweld marked the partial demise of the so called intra-enterprise conspiracy doctrine, a concept first introduced by the Supreme Court in United States v. Yellow Cab Company, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Under the intra-enterprise conspiracy doctrine it was possible to find a parent corporation and it's corporate subsidiary capable of conspiring together in violation of the Sherman Act even if they formed a single enterprise with common ownership. The result was to subject the relationship between a parent corporation and its corporate subsidiaries to the same Section 1 scrutiny as economically independent, unaffiliated corporations.
The doctrine has been criticized almost since its inception as placing form over substance. Much of this criticism has focused on the inconsistencies which the concept of intra enterprise conspiracy fostered in the case law.[2] As a result of applying the doctrine, courts viewed the conduct of enterprises organized into corporate subsidiaries as that of potential conspirators under Sec. 1 of the Sherman Act. However, those same courts treated identical conduct by firms organized into unincorporated divisions as immune from Sec. 1 scrutiny *1244 because unincorporated divisions were not subject to the fiction which gives an incorporated subsidiary a separate legal identity from its corporate parent. Without the legal fiction of separate identity, courts declined to treat an unincorporated division as a `person' for antitrust conspiracy purposes. The only feature which distinguished these two lines of cases was the form in which the enterprise was organized.
Under the intra-enterprise conspiracy doctrine as developed in the case law, a corporation's organizational choices, and not its economic conduct, determined whether or not the sub-units of the corporation could be conspirators. The doctrine gives undue emphasis to the fact that a subsidiary is separately incorporated from its parent, and encourages courts to treat as concerted action by two entities what is in reality the unilateral behavior of a single economic unit.
The Supreme Court recognized the validity of this criticism and responded in Copperweld by abrogating the doctrine as it applied to wholly owned subsidiaries. The Court reasoned that:
A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousness but one.... With or without a formal "agreement" the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for Section 1 scrutiny. Copperweld, supra 104 S.Ct. at 2742.
The Court obviously focused its analysis on the economic consequences of the relationship between a parent and its wholly owned subsidiary and not the mere formality of their separate incorporation.
Wholly owned subsidiaries are not independent economic forces, but mere subunits of the larger enterprise which owns them. The economic force represented by such a subsidiary is controlled by the parent for its benefit. Because the coordination of activities between parent and subsidiary does not cause ".. the sudden joining of economic resources that had previously served different interests.." or deprive the market place of a previously independent economic decisionmaker, the Copperweld Court saw no reason to subject such coordination to analysis for antitrust conspiracy.
The Court ruled that total ownership of a subsidiary was sufficient to establish the economic unity which would insulate the enterprises from allegations of a conspiracy for antitrust purposes. Total ownership implies total control, which in turn negates the inference of independent decision making which separate incorporation might otherwise suggest, and which is necessary to establish a conspiracy.
It seems clear that the degree to which the parent actually exercises its power to control a subsidiary was not as important to the Court in Copperweld as the parent's possession of that power.
... [I]n reality a parent and a wholly owned subsidiary always have a "unity of purpose or common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests. Copperweld, supra at 2742.
That power to control is what keeps the economic force of the subsidiary in line with the goals of the parent. It is also the most compelling reason for treating the enterprise as a single economic unit.
Antitrust law seeks to protect competition in the marketplace by limiting how an enterprise can exercise its economic power. If the economic power of affiliated enterprise is controlled and coordinated by one decisionmaker for the benefit of the enterprise as a whole, then the exercise of that power should be viewed as the conduct of a single economic force. Economic realities, *1245 not corporate formalities, should guide courts in their analysis of this issue. Copperweld supra. In our opinion, this is true whether the corporate subsidiary is wholly or partly owned. If the parent has sufficient control of the subsidiary to dictate its economic policy, it seems illogical to treat the two corporations as separate or competing economic forces.
Antitrust law is aimed at preventing the economic consequences of certain behavior which society has deemed undesirable in a system of free and open competition. As to concerted action, antitrust law focuses on the danger presented to the competitive system by the joining of previously independent and competing economic forces. Concerted activity of this sort supresses the independent decisionmaking which a competitive marketplace demands.
In the case of partially owned subsidiaries, the presence or absence of the parent's power to dictate economic policy is necessarily a more fact specific inquiry than in the case of wholly owned subsidiaries. Some partially owned subsidiaries are controlled by their parent, others are not.
The most readily apparent evidence of a parent's power to control a partially owned subsidiary is its use of that power. The more centralized the management of an enterprise, the more evident it becomes that the enterprise is being operated as a single economic unit. However, modern corporate structure is such that complex business organizations are frequently operated on the basis of very general policy directives from the parent corporation, with decisionmaking authority delegated to employees of the subsidiary, subject to review and approval by the parent where necessary. Indeed this is the management philosophy preferred by Pennzoil and implemented by its management following the takeover of United (see transcript page 14577).
Thus, while the degree of day to day control actually exercised by the parent of a partially owned subsidiary is relevant, it is not always an accurate measure of the parent's power to control that subsidiary. Other factors which may help gauge this power include the presence of overlapping management, the filing of consolidated financial statements or tax returns, the percentage of the subsidiary's stock which the parent owns, the reasons for organizing the enterprise in subsidiary form, and whether or not the corporations are held out to be distinct legal entities or competitors.[3]
While none of these factors is controlling in any particular case, they are all aimed at establishing the degree of control which a parent can exercise over its partially owned subsidiary. If a partially owned subsidiary does not retain the power to set its own economic course, it is difficult to perceive of it as an independent actor in the formation of a conspiracy with its parent. Conversely, if the parent has the power to compel its subsidiary to go along with an anti-competitive scheme then the subsidiary cannot be viewed as having the capacity to join the conspiracy; there is no meeting of independent minds, nor is the marketplace deprived of an independent economic decisionmaker.
The mere formality of separate incorporation does not justify ignoring this reality. If an enterprise is operated as a single unit it should be treated as one for antitrust purposes regardless of how it is organized. The goal of antitrust law is to benefit the consumer by promoting economic efficiency and protecting competition. The decision of an enterprise to operate in corporate subsidiary form is not, in itself, a threat to competition. In fact, such a decision may improve an enterprise's efficiency and thus benefit the marketplace.
A corporation may elect to operate through corporate subsidiaries for a variety of reasons unrelated to antitrust concerns. Separate incorporations may improve management, reduce Federal or State taxes, facilitate compliance with regulatory *1246 or reporting laws, or avoid special tax problems relating to multi-state operations. Separate incorporation may also improve local identification with an enterprise's product or encourage local investment in a particular aspect of a larger concern. Copperweld, supra, at 2743.
It is inconsistent with the goals of antitrust law to make conspiratorial capacity turn on an enterprise's choice of organizational structure. If an enterprise uses the economic force of its corporate subsidiaries as part of an anti-competitive scheme, its conduct should be judged as that of a single entity unless it can be shown that the subsidiary was capable of exercising independent judgment in deciding to join the scheme.
Under the intra-enterprise conspiracy doctrine, courts have tended to presume that a parent and its subsidiary have the capacity to conspire together based on the formality of separate incorporation. Some showing of operational integration has been necessary to overcome this presumption. Presuming conspiratorial capacity in this way, solely on the basis of separate incorporation, obscures the distinction which antitrust law draws between concerted and independent action and diverts attention from the economic realities which that law seeks to address and control.
If a party alleges a conspiracy between a parent and its corporate subsidiary, the burden must be on that party to prove that the conspiracy took place. To establish this fact it must be shown that the alleged conspirators were capable of conspiring together. We now examine the record of this case to determine if it supports a finding of conspiratorial capacity between Pennzoil and United.
As previously noted, Pennzoil and United were affiliated during the entire period in which LP & L alleges they planned and executed an antitrust conspiracy. The record establishes, and both parties admit, that when Pennzoil acquired 42 percent of United Gas Corporation's stock in December 1965, it acquired a controlling interest. (LP & L original brief pg. 29, Tr. pg. 14562) Shortly thereafter, in January 1966, Pennzoil was able to place a number of its nominees on the board of directors of both United Gas Corporation and it's wholly owned subsidiary, United Gas Pipeline Company. These new board members, most of whom were also directors of Pennzoil, constituted a majority of both boards. (Tr. pg. 14727) From that point on, it is clear that Pennzoil exercised ultimate control over the actions of United Gas Corporation and United Gas Pipeline Company.
Hugh Leidtke, chief executive officer and chairman of the board of Pennzoil, testified that Pennzoil encouraged it's subsidiaries to formulate their own policy ideas, even on topics as important as the curtailment of gas deliveries. However, he also testified that those ideas were submitted to Pennzoil to determine if the corporate parent objected to the subsidiary's plans or felt that it conflicted with overall corporate policy. (Tr. pg. 14619-14625).
The testimony of William Leidtke, president of Pennzoil, also illustrates that Pennzoil, as the parent corporation, reviewed and approved the major decisions of United Gas Pipeline Co., it's wholly owned subsidiary. (Tr. pg. 14821-14828) Although Pennzoil's approval was often given tacitly, by not objecting to United's proposals, the fact remains that Pennzoil reviewed United's decisions and, most importantly, had the power to accept or reject them. When one keeps in mind that a majority of United's directors, who were responsible for formulating these ideas, were Pennzoil appointees, it becomes quite obvious that Pennzoil could exercise control over the decision making processes at United. Although Pennzoil did not directly dictate policy to United, it retained the power to veto decisions made by the boards of United Gas Corporation or United Gas Pipeline Company.
Moreover, most of the corporate decisions which are relevant to LP & L's antitrust claims were made after Pennzoil had acquired a controlling interest in United and had placed its nominees on the boards *1247 of United Gas Corporation and United Gas Pipeline Company. Thus, during the period in question, Pennzoil not only had the power to veto any policy choice with which it did not agree, but also had direct input into the process by which those choices were made.
In April, 1968, Pennzoil was able to compel a merger of the two corporations. In December, 1968 Pennzoil was able to cause United Gas Pipeline Co. to pay a dividend of $51,000,000.00 to it's new owner. Pennzoil justified this dividend and a subsequent loan by Pennzoil to United as a means of restructuring United's debt-equity ratio in order to obtain more favorable rates from regulatory agencies. Regardless of the truth of this assertion, Pennzoil's actions clearly demonstrate that it had the power to dictate economic policy to United and used that power as it saw fit.
Under these circumstances, we must conclude that Pennzoil and United were operated as a single economic unit for the benefit of the Pennzoil corporate enterprise. What United lost in the Pennzoil takeover was its power to make the final decision as to its economic policies. After 1965, United was no longer an independent economic force, but a sub-unit of Pennzoil without the capacity to conspire with its new parent.
LP & L contends that under Louisiana Law a corporation can conspire with its individual members, shareholders and managers in violation of antitrust law, citing Tooke & Reynolds v. Bastrop Ice & Storage Co., Inc., 172 La. 781, 135 So. 239 (1931). In that case, the plaintiff claimed that Bastrop Ice and Storage Co. had attempted to monopolize the ice market in the Bastrop area by cutting its price below cost in an attempt to drive him out of business. The plaintiff contended that the owners, directors and managers of Bastrop Ice and Storage Co. conspired with that corporation to monopolize and restrain trade.
The case was before the Court on an exception of no cause of action, and the facts alleged in plaintiff's petition were therefore accepted as true. The Court concluded that those facts stated a cause of action for conspiracy to restrain trade and monopolize trade under Louisiana Law. However, the merits of plaintiff's allegations, as opposed to their sufficiency to state a cause of action, were not before the court. Viewed in this light, the holding in Tooke & Reynolds stands only for the proposition that Louisiana law recognizes a cause of action based on allegations of conspiracy between a corporation and it's shareholders, members, and managers to violate antitrust law.
In this case, LP & L does not allege such a conspiracy. In its original petition, LP & L names only Pennzoil Company and United Gas Pipeline Company as defendants. The petition contains no allegations of conspiracy between either of those corporations and any of their employees, shareholders, or directors; nor was such a contention made at trial or in brief to this Court. Under these circumstances, we fail to see how Tooke & Reynolds is relevant to the case at hand, which involves allegations of a conspiracy between affiliated corporations, not between a corporation and its employees or directors.
We recognize that there is language in Tooke & Reynolds which implies that there was a combination between Bastrop Ice and Storage Co., Inc. and its parent corporation, Louisiana Ice and Cold Company of Monroe. However, the petition in Tooke & Reynolds does not appear to have alleged such an intra-enterprise conspiracy, and only prayed for judgment against Bastrop Ice and Storage and its two managing directors. The right to pursue the other corporations was specifically reserved for a future suit. Thus, the question of a conspiracy between a parent corporation and it's corporate subsidiary was not before the Court, and its pronouncements on that subject are not binding on this Court.
The same can be said of Economy Carpet v. Better Business Bureau, 361 So.2d 234 (La.App. 1st Cir.1978), writ denied 362 So.2d 1387 (La.1978), also cited by LP & L. That case involved allegations of a conspiracy *1248 to restrain trade between the Better Business Bureau and its employees. The issue of conspiracy between affiliated corporations was not raised in that case. The rule which we announce today is not controlled by Tooke & Reynolds or Economy Carpets, nor is it in conflict with those cases. We have been cited to no Louisiana case which directly addresses the question of when affiliated corporations can conspire together in violation of state antitrust law.
As stated earlier in this opinion, LP & L's claims against Pennzoil and United appear to rest exclusively on the theory that those entities either conspired together to restrain trade or conspired together to monopolize or attempt to monopolize trade. However, due to the serious nature of the allegations in this case, we will nonetheless address the issue of whether the Pennzoil-United enterprise, viewed as a single economic unit, either monopolized or attempted to monopolize trade.
To maintain a claim of unlawful monopolization under R.S. 51:123 (or Sec. 2 of the Sherman Act), the plaintiff must establish, by a preponderance of the evidence, that the defendant: 1) possessed monopoly power in a clearly defined economic and geographic market, and 2) had the general purpose or intent to exercise or maintain that power. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).
The threshold question in these cases is whether or not the defendant possesses monopoly power. Monopoly power is the power to control prices or exclude competition. United States v. E.I. DuPont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). To determine the existence of monopoly power it is necessary to define the market within which that power is allegedly exercised. Without a clearly defined market there is no backdrop against which to measure a defendant's ability to control prices or exclude competition.
In antitrust cases, the market which is relevant is the area of effective competition within which the defendant operates. This market has two elements, product and geography. As to product, the relevant market consists of those goods which are reasonably interchangeable for the purpose for which they are produced, taking into account price, use and quality. United States v. DuPont, supra. The geographic element of the relevant market is the area in which sellers of the defendant's product operate, and to which buyers can practicably turn to obtain that product. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).
LP & L has urged that the relevant product market in this case is natural gas for use as boiler fuel and that the relevant geographic markets are the areas immediately proximate to its generating stations at Sterlington and Nine Mile Point. (LP & L original brief page 32-34, reply brief page 44-45). We do not address the correctness of LP & L's choice of these markets because we have concluded that LP & L did not prove that United or Pennzoil, separately or as a single economic unit, possessed monopoly power in any market, including those urged by LP & L.
Monopoly power is the power to control prices or exclude competition. The record reveals that Pennzoil and United were unable to do either. LP & L contends that by misrepresenting its gas reserves to Federal regulators and the public, United was able to prevent other suppliers from either entering the market or increasing their share of the available business. The record does not support this contention.
In the late 1960's, Texaco, which had been supplying all the needs of LP & L's Little Gypsy Station since the late 1950's, was given the right to serve two thirds of the requirement of the Nine Mile Point. Prior to this time Texaco had not provided any gas to Nine Mile Point. The reason Texaco got this increased business was that it offered a cheaper price. (Tr. pg. 266-67). Texaco actively pursued this business and was willing to incur the expense *1249 of constructing a pipeline to the Nine Mile Point Station to get it. Texaco clearly was an active and effective competitor in the marketplace. It is also clear that United did not possess the power to exclude this competition.
The negotiations, which resulted in the 1968 gas supply contract at Nine Mile Point provide a further graphic illustration of United-Pennzoil's inability to exclude competition or demand a monopoly price for its product. The record shows that LP & L was able to demand and receive price concessions from United by threatening to place new units at a facility which United did not have a contractual right to serve and which could be supplied with less expensive gas from Texaco. To avoid a drastic decrease in its sales to LP & L, United not only agreed to lower its price at Nine Mile Point, but also agreed to waive its contractual right to be the sole supplier of gas at that facility. The result of this last concession was that United only provided one third of the requirements of Nine Mile Point after 1968 and Texaco supplied the other two thirds. LP & L contends that United actually increased its sales as a result of the 1968 contract because of increased capacity at Nine Mile Point. We disagree.
United's increased sales were the result of an increased demand for gas at Nine Mile Point. These increased sales do not rebutt the undeniable fact that United's share of the Nine Mile Point "market" decreased dramatically, as a result of the 1968 contract. This scenario is hardly the picture of a monopolist wielding its power to exclude competitors or control prices. In fact, it is just the opposite; United was forced to lower its price to LP & L and surrender two thirds of what had previously been its exclusive market to Texaco.
Having evaluated the myriad of evidence, documentary and otherwise, presented by LP & L we have concluded that United-Pennzoil did not possess monopoly power in the markets defined by LP & L. The trial judge was therefore correct in dismissing LP & L's claim that Pennzoil-United monopolized trade.
We next address LP & L's contention that Pennzoil-United attempted to monopolize trade. To maintain a charge of attempted monopolization it must be proven that the defendant had a specific intent to destroy competition or build a monopoly. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). It must also be established that the defendant engaged in predatory conduct in furtherance of that intent, and that there was a "dangerous probability" the attempt would succeed. In our opinion LP & L has failed to prove any of these elements.
A desire to increase business is not sufficient to establish the specific intent to monopolize. Every business desires to increase its share of the market. It is only when that desire includes the specific intent to destroy competition or control prices that antitrust principals are violated. United States Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). It is obvious that United-Pennzoil wanted to increase its share of the market. However, it is far from clear that they had the specific intent to monopolize trade.
The evidence which LP & L presented in support of this claim is open to more than one interpretation. Much of it is concerned with the shift in jurisdictional status of the gas being supplied to LP & L. In our opinion, the evidence does not show that United-Pennzoil's efforts in this area actually excluded competition or were intended to do so. Rather, it tends to show an intent to rewrite United's contract with LP & L and other power plants by the use of federal regulations. Texaco clearly was and remained a vigorous and effective competitor in the marketplace throughout the period in question. Moreover, United never attempted to charge monopoly prices by it's applications to Federal regulators, although some price increase was clearly its goal.
*1250 These actions may raise breach of contract issues, but they do not provide a sufficient basis for imposing antitrust sanctions. The record simply does not support the conclusion that United-Pennzoil attempted to monopolize trade. There clearly was no `dangerous probability' that Texaco, or any other company, would be excluded from the market by United-Pennzoil's activities or that those activities would give United-Pennzoil the power to control prices. The trial judge was therefore correct in dismissing this claim.
Finally, we address the dismissal of LP & L's revocatory action against Pennzoil. This action was aimed at setting aside dividends paid by United to Pennzoil. LP & L contended that the payment of this dividend was in fraud of its rights because it impaired United's ability to fulfill its contractual commitment to LP & L. LP & L also contended that payment of the dividends made it impossible for United to satisfy the judgment which LP & L anticipated would be rendered in its favor on the contract issue.
Under former C.C. Art. 1968, a revocatory action could not be maintained:
"unless the contract be broken, nor until judgment be obtained for the recovery of what is due in consequence of its breach.".
As previously noted, the antitrust and revocatory actions were severed from the contract action below. At the time the revocatory action was dismissed the trial judge had not yet determined if a breach of contract had occurred. Because a finding of a breach is a prerequisite to the revocatory action, the trial court acted prematurely in dismissing this claim.
The record in the breach of contract action is not presently before the court and we are therefore unable to rule on the merits of the revocatory action. Accordingly, we remand this claim to the trial court for its consideration. If the court has already found that a breach occurred, a hearing on the merits of the claim should be held.
The judgment of the trial court dismissing the antitrust claims of LP & L against United and Pennzoil is affirmed. The judgment dismissing LP & L's revocatory action against Pennzoil is reversed and the issue is remanded to the lower court for further proceedings consistent with this opinion and the law.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.
GARRISON, Judge, concurs in part and dissents in part.
I concur in that part of the majority opinion which reverses the trial court's dismissal of LP & L's revocatory action against Pennzoil. However, I must respectfully dissent from the remainder of the opinion.
On March 3, 1983 Pennzoil filed a written motion for a directed verdict under the then C.C.P.Art. 1810(B), now C.C.P.Art. 1672[1] as follows:
"B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the actions as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence."
On that same day, United Gas Pipeline also filed a written motion for a directed verdict. While Pennzoil's motion was not specifically limited to a particular cause of action or theory of recovery, United Gas' motion was specifically limited to the antitrust claim.
The trial court entered judgment, however, "... only insofar as the antitrust claim and revocatory action are concerned", *1251 granting both Pennzoil and United's motions for a directed verdict and dismissing LP & L's actions on March 31, 1983.
From that judgment, LP & L appeals.

I FACTS
LP & L entered into 20 year contracts with United Gas specifying certain prices and amounts of gas to be delivered (basically, all gas needs). Additionally, the contracts provided that United Gas would be the exclusive supplier. LP & L granted these concessions because it wanted to build more generating plants. The most serious factor in choosing the location of the plant is the cost of transporting fuel to the generating facilitythe further it must be transported, the more it will cost. Once LP & L was assured by United that all their gas needs would be met for 20 years, LP & L relied on that representation and built its plants in the middle of United's producing gas field (the Sterling Plant in Monroe) or as close as they could get to a United Field (Nine Mile Point in Jefferson Parish). The practice of entering into 20 year supply contracts was a common one at the time of the contract. The 20 year period contracts originally arose as a form of "collateral" for the issuance of bonds and debentitures. A 20-year Reserve/Production Ratio Life was required for the issuance of 20 year bonds. This requirement was later adopted by the Federal Power Commission. Twenty year contracts were the response of pipeline companies located in Texas and Louisiana to the post-World War II increase in competition resulting from the sale of "Long Lines" (i.e. pipelines running directly to the east coast) built by the Defense Department during the War and sold to private companies and individuals after the War.
The pipeline company (United Gas Pipeline Co.) was a wholly-owned subsidiary of United Gas Company. Both corporations did exceedingly well until 1968.
The Comparative Balance Sheet of United Gas Pipeline Company's Form 2 lists earned surplus at the beginning and end of each year for the period 1960 through 1970 as follows:

 Beginning Year End Year
1960 49,949,501.35 62,280,816.99
1961 62,280,817.00 47,475,922.00
1962 46,413,761.00 51,736,746.00
1963 51,736,746.00 56,226,078.00
1964 57,014,960.00 57,790,972.00
1965 57,790,972.00 61,444,657.00
1966 61,444,657.00 62,123,570.00
1967 62,123,570.00 59,799,315.00
1968 59,799,315.00 8,856,983.00
 _____________ _____________
1969 8,856,983.00 23,593,812.00
1970 23,593,812.00 32,343,533.00
 (Emphasis added)

The massive drop in earned surplus (profit) which occurred in 1968 was not the result of changes in the market such as increased competition resulting from discovery of a new form of energy or creation of a better system of distribution, nor was it the result of corporate inefficiency or mismanagement. It was the result of an accounting/financial maneuver by another corporationPennzoil.
Pennzoil waged a takeover against the parent, United Gas Corporation. While Pennzoil was unsuccessful in its attempt to gain majority (51%) stock ownership, it did succeed in purchasing 42%. Pennzoil, led by its principal owners, Hugh and William Liedtke, deposed the old Board of Directors. The minutes of the United Gas Corporation dated February 23, 1966 reflect that on that date Hugh Liedtke was appointed Chairman of the Board and William Liedtke was appointed Chairman of the Executive Committee. The executive Committee consisted of Messrs. Boviard, Everett, Haslanger, Kerr, Hugh Liedtke, William Liedtke, and Ed Parkes.
William Liedtke testified that in mid-1967 they hired Arthur D. Little Company to conduct a study of various components of the Pennzoil system. Liedtke further testified that the results of the Little Study were in their hands prior to the merger, which did not occur until 1968.
The Liedtke's attack on United did not go unnoticed in the national business press. See: "Love Her and Leave HerThat, say *1252 the critics, is just what the Liedtke brothers did with United Gas" Forbes, Sept. 15, 1974 p. 54-57. Attached as Addendum A.
In 1968, a dividend of $50,942,332.00 was paid to Pennzoil out of Earned Surplus. Apparently, none of the other 58% of the shareholders or the majority ownership of United Gas Co. received any of that "dividend".
The Little study noted three basic but critically important facts:
1. The Texas State Commission authorizes a higher rate of return than the Federal Power commission.
2. The Federal Power Commission authorizes a higher rate of return than the Louisiana Public Service Commission.
3. The two state Commissions (Texas and LPSC) can only regulate intrastate gas, whereas the Federal Power Commission can only regulate interstate gas.
The Little study came to three conclusions:
1. The Houston-Beaumont system was the most profitable.
2. The San Antonio area was the biggest loss.
3. The New Orleans District 5 was a losing proposition due to the long-term contracts at low prices. (United was losing at a rate of 11.73%).
Accordingly, three plans were apparent:
1. Get rid of San Antonio.
2. Expand Houston-Beaumont (Which was at the highest rates under the Texas State Commission).
3. Remove the New Orleans District 5 area out from under the low Louisiana Public Service Commission structure into the higher Federal Power Commission rate structure and get out of the long-term fixed low-price contracts.
Accordingly, Pennzoil dumped the San Antonio system by selling it to Coastal States Gas Corporation.
At this point, the plot gets slightly more complex. United was required contractually to keep reserves specifically held for LP & L. United resold the gas reserved for LP & L to the Houston-Beaumont system (at a higher price) and failed to purchase additional gas to replace the LP & L reserves. United was careful, however, to retain the solely intrastate nature of all gas sold to the Houston-Beaumont district by creating a "pass-thru" corporation named Pennzoil Pipeline Company.
In contrast to the care taken to preserve the intrastate nature of the Texas gas, United by its own unilateral act and in violation of the F.P.C. regulations caused the Louisiana gas to become interstate and thus "subject to a higher return".
Roughly, intrastate gas is produced, transported, and delivered to the purchaser all within a state and without crossing state lines. Interstate gas is that shipped across state lines. Ever since 1953, United had strict orders from the Louisiana Commission not to mix the Louisiana intrastate gas into pipelines of its interstate gas facilities, because under the jurisprudence, once the gas is commingled it loses its intrastate character and becomes interstate gas no longer under the control of the L.P.C., but under the control of the Federal Power Commission and its rate structure. United did in fact "turn the six valves," thus commingling the gas and by its sole and unilateral act of turning six valves, was able to defeat the entire structure and jurisdiction of the Louisiana Public Service Commission and the State of Louisiana and breach its contracts. The commingling of gas and pumping formerly intrastate gas over state lines continued for many months during which United lied on the required F.P.C. Form 15s not only about the pumping situation, but also falsified its reported reserves, by showing that it still had the gas reserves already resold to the Houston area.
At the behest of the Liedtke Brothers, President Nixon had appointed the following people to the Federal Power Commission:
1. John NassikasChairman of the F.P.C.
*1253 2. R. Gordon Goochan attorney with Pennzoil's law firmGeneral Counsel to the F.P.C.; and
3. Rush Moodythe Liedtke's attorneyas an F.P.C. Commissioner.
From the new F.P.C. members, United received a judgment declaring that "Pennzoil Pipeline Company" (the pass-through corporation created to protect the intrastate character of the Houston-Beaumont gas) was indeed authorized as an intrastate company. The Liedtkes additionally petitioned the F.P.C. for a "Certificate of Public Conveyance and Necessity" alleging that all of United's transmission facilities in South Louisiana were interstate due to United's deliberate and unilateral act in commingling the gas against LP & L's orders, hence United is subject to F.P.C. regulation and not the Louisiana Public Service Commission. The application was granted by the F.P.C. Litigation ensued and the Fifth Circuit Court of Appeals, unaware of the fraudulent forms and acts described above, affirmed the F.P.C.'s ruling. The falsification of the documents and other acts were not discovered until 1982, hence the Fifth Circuit Court did not have benefit of the later Federal Energy Regulatory Commission's Investigation and finding that United had knowingly and willfully violated Section 7 of the Natural Gas Act.
In October of 1970 in the last brilliant maneuver of a stunning triple-play, United petitioned the F.P.C. alleging that it had a temporary shortage of gas supplied (i.e. no reserves) and that it would be necessary to institute a "curtailment plan".
The curtailment plan provided that the F.P.C. would impose "cooperation, voluntary or otherwise on United's direct industrial customers" and that United would be free from liability when it breached its contracts. United further informed northern and eastern utility companies that if the curtailment plan were not approved they would be receiving no gas (hence no heat) during the upcoming long cold winter. The northern and eastern utilities lobbied the F.P.C. for the passage of the curtailment planand pass it did with an "imposed cooperation provisions" that LP & L and all industrial customers must pay a "compensatory price" (higher than the contract price) and that all sales of boiler fuel would be terminated in three years. On the same day the curtailment plan was certified to the F.P.C., United filed an action to show cause why it should not abandon service to all companies not paying the "compensatory price".
The curtailment plan had two seasons Summer and Winter. Upon approaching the Summer season (peak electricity usage in the hot South) United informed LP & L that unless it paid a higher price, United would put LP & L in the lowest priority category and LP & L would get no gas, hence would not be able to generate enough electricity and the South would be without air conditioning, just as the North would have been without heat. Since the initial filing of the curtailment program in 1970, United has filed a curtailment plan with the F.P.C. or its later successor the Federal Energy Regulatory Commission every six months. Various litigation has ensued. The Fifth Circuit has rejected the United plans on three occasions and has never found any plan to be a "just and reasonable one" within the Natural Gas Act.
It should be noted that the "curtailment plan" was necessitated by the "shortage" created by United when it (1) resold its already sold reserves and (2) failed to buy new gas to replace its sold reserves. In brief, the "shortage" is United's own creation.
For purposes of this dissent, the above statement of facts will suffice. There are other issues, such as Pennzoil's spin-offs from United, but they are not relevant to this dissent.

II OVERVIEW OF ANTITRUST LAW
"Antitrust law" is a generic term referring to a wide scope of business regulations and statutes:

*1254 "A total of 71 statutes (including the Clayton Act) are set forth in a compilation prepared by Elmer A. Lewis, Superintendent of the Document Room, House of Representatives, entitled Antitrust Laws with Amendments, 1890-1951 (1951). Of these statutes, 21 were on the books in 1914 when the Clayton Act was enacted, and 49 became law thereafter."[2]
In addition to the three basic antitrust statutes: the Sherman Act, the Clayton Act and the Federal Trade Commission Act, numerous other acts have been construed as being part of "Antitrust Law,"[3]:
1. Interstate Commerce Commission Act of 1887
2. Securities Acts of 1933 and 1934
3. Robinson-Patman Act of 1936
4. Wilson Tariff Act of 1894
5. Shipping Act of 1916
6. Webb Export Act of 1918
7. Federal Reserve Amendments of 1919
8. Miller-Tydings Act of 1937
9. Civil Aeronautics Act of 1938
10. Communications Act of 1934
11. Public Utilities Holding Co. Act of 1935
12. Wheeler-Lea Act of 1938
13. Copeland Foods Drug & Cosmetic Act of 1938
14. Wool Products Labeling Act of 1939
Additionally, the American Bar Association's publication State Antitrust Law deals with a number of areas including: restraint of trade, monopolization, price-fixing, exclusive dealing and tying arrangements, market division and customer allocation, boycotts, individual refusals to deal, ancillary restraints such as restrictive covenants, unfair methods of competition, mergers, price discrimination at the customer level, seller level and unusually low prices. The sanctions provided under Louisiana law include criminal penalties under R.S. 51:122, 123, 126 and 140, R.S. 51:331-332, R.S. 51:411, R.S. 51:423 and 371. Both public and private actions may be brought for injunctions under R.S. 51:128-129. There are administrative antitrust sanctions under R.S. 51:423 and R.S. 51:361-371. There is also a requirement of forfeiture [4] of charter for a domestic corporation or ouster from the State for a foreign corporation under R.S. 51:139 and lastly there is the private treble damage action under R.S. 51:137.
Many of Louisiana's statutes are modeled on Federal antitrust provisions. For example, R.S. 51:411 "Advertisements, untrue or misleading" is based on 15 U.S.C. Section 52 et seq., the Federal Trade Commission Act prohibition of false advertising or the Wheeler-Lea Act, above. Likewise, R.S. 51:122, 123, 124 (Act. No. 86, Acts of the General Assembly of 1890) follows Section 7 of the Sherman Act, 15 U.S.C. Sections 1, 2, 13.[5]
Thus it finally becomes apparent that due to the broad scope of antitrust law and the long chain of actions over several decades, this court is not dealing with one action under one theory, but rather a number of actions under a variety of theories and statutes.

III ADVERTISING VIOLATIONS
With that thought in mind, the first potential antitrust violation is under R.S. 51:411 which provides:
"No person, with intent to sell or in any way dispose of merchandise, securities, service, or anything directly or indirectly, to the public for sale or distribution, *1255 or with intent to increase the consumption, or to induce the public in any manner to enter into any obligation relating thereto, or to acquire title, or an interest therein, shall make, publish, disseminate, circulate, or place before the public, or cause directly or indirectly to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, hand-bill, poster, bill, circular, pamphlet, or letter, or radio broadcasts, telecasts, wire, wireless, motion picture, or in any other way, an advertisement of any sort regarding merchandise, securities, service, or anything offered to the public, which advertisement contains any assertion, representation or statement of fact which is untrue, deceptive or misleading." (Emphasis added).
Admitted into evidence at Volume 6 of the record pages 241 thru 243 are various advertisements by United Gas Pipeline as LP & L-Rodriguez Exhibits:

Rodriguez # 4An advertisement of United Gas dated Wednesday March 21, 1962, the headline of which states "Gang Way More Gas For You and Industry Too."

Rodriguez # 5An advertisement of United Gas dated Wednesday May 23, 1962, the headline of which states "Get Our Gas From United."

Rodriguez # 6 An advertisement of United Gas dated June 20, 1962, the headline of which states "Expansion of United Gas Systems Spurs Growth of the Gulf South."

Rodriguez # 7An advertisement of United Gas dated Wednesday October 24, 1962, the headline of which states "Another Milepost of United Gas Progress."

Rodriguez # 8  An advertisement of United Gas dated December 19, 1962 entitled "Beneath This Christmas Tree, Natural Gas."

Rodriguez # 9An advertisement of United Gas dated December 2, 1963, the headline of which states "Dependable Gas Service Just Doesn't Happen."

Rodriguez # 10An advertisement of United Gas dated Wednesday June 23, 1965, the headline of which states "Industrial Fuel is No Problem Here. United Gas Can Meet All of Your Needs."

Rodriguez # 11 An advertisement of United Gas, the headline of which states "No Worry Worry Worry WorryAbout Running Out of Gas With United."
It is agreed by all parties that one of the major considerations for plant location (and in turn the question of which company would get the contract) was a desire to have a sure, stable, and steady supply of intrastate gas over long periods of time. The advertisements above were not only widely published in trade journals, but also were specifically sent to LP & L during early contract negotiations along with a letter specifically representing that United would be able to meet LP & L's needs.
The ads introduced were part of a twofold marketing strategy undertaken by United at that time. United was actively involved in a new sales campaign to increase the number of its customers. At the same time, however, United was actively depleting its reserves by not replacing reserves as they were used and by releasing or selling reserves, to other oil companies, such as its 1962/63 sale of 5 trillion cubic feet to Humble Oil. In the period from 1963 to 1966 the deliverable life (inventory) had declined from 17 years to 5 years. The release of gas reserves further caused a decline of 10 years in one calendar year. In this manner, United knowingly created a shortage at the same time that it had stated "United Gas Can Meet All of Your Needs."
The court is familiar with what are commonly called "lulling" cases in which usually an insurance claims adjuster will "lull" a claimant into a belief that his claim will be paid until the date of prescription is past, only to reverse the representations made and deny the claim on grounds of prescription.
In the instant case, United "lulled" LP & L, as well as its customers and the public at large into a false belief that "United Gas *1256 (Could) Meet All of (Their) Needs". LP & L then relied to its detriment on the false representations knowingly and intentionally made to them by United.
It is clear that United's ads were "untrue, deceptive, or misleading" under R.S. 51:411. Accordingly, the trial judge erred in granting the motion.

IV COMBINATIONS
Turning to R.S. 51:122 that statute provides:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal.
It should be noted that while the Louisiana statute above is based on the Sherman Act, the Louisiana courts are not bound by federal decisions dealing with similar situations:
"... a state statute is being interpreted and no federal question or federal constitutional principle is involved which compels this Court to follow the views expressed by the United States Supreme Court. Under these circumstances Louisiana's highest court is free to interpret this State's law in accordance with its understanding of the legislative intent and its appreciation of what is more logical, reasonable and just."

George Engine Co., Inc. v. Southern Shipbldg. Corp., 350 So.2d 881, 886 (La., 1977).
It should be further noted that the federal courts have already concluded that the issues presented in this case are not subject to federal jurisdiction, and do not present a federal question. City of New Orleans, State of La. v. United Gas Pipe Line Co., 390 F.Supp. 861 (U.S.D.C., E.D. La., 1974). Accordingly, any references to the Sherman Act are persuasive only and are not binding on this court.
The Sherman Act also uses the language "Every contract combination in the form of trust or otherwise, or conspiracy". This language was aimed at a variety of activities:
a. Cartels
b. Monopolistic mergers
c. Predatory practices[6]
Cartels also called "loose combinations" refer to any device by which common ownership or control exists. Apparently all types of "combinations" are meant to be included as the phrase "in the form of trust or otherwise" was specifically included. "The word `trust' originally gained currency to describe anticompetitive combinations because the trust device was used to gather industries or large parts of them under single ownership and control. Congress intended to prohibit cartels by employing words that suggest every range of coordination from the loosest general understanding to the tightest-knit integration."[7] The question then arises whether Pennzoil's actions with United Gas Pipeline constitute an illegal cartel arrangement. Manipulation of market division was one of the "evils" specifically sought to be abolished by the Sherman Act.
Monopolistic mergers and predatory practices are likewise specifically sought to be abolished. Sherman himself[8] expressly stated the philosophy against both:
"... It can control the market, raise or lower prices, as will best promote its selfish interests, reduce prices in a particular locality and break down and advance prices at will where competition does not exist ... Such a combination is far more dangerous than any heretofore invented, ... it tends to advance the *1257 price to the consumer of any article produced, it is a substantial monopoly injurious to the public, and, by rule of both the common and the civil law, is null and void and just subject to restraint by the courts, of forfeiture of corporate rights and privileges, and in some cases should be denounced as a crime, and the individuals engaged in it should be punished as criminals. It is this kind of a combination we have to deal with now."[9]
Sherman also stated "The price to the consumer depends upon the supply, which can be reduced at pleasure by the combination."[10]
The Sherman Act, however, did not seek to outlaw efficiency such as creation of a superior product, invention of a faster and cheaper means of transportation et cetera.[11]
United Gas by selling its reserves already "sold" and committed under contract, artificially reduced its reserves hence limiting supply while it simultaneously stimulated demand via its sales campaign. It is exactly this type of activity that the Sherman Act was meant to prevent.
As to Pennzoil's activities, it did not create a superior product, nor did it develop a faster, cheaper method of distribution. In fact, the distribution pipelines it purchased and the product delivered thereby are exactly the same. Mr. Ed Parkes, the President of United Gas Corp. prior to the takeover bid and a Director of Pennzoil-United, Inc. thereafter, testified that the sole purpose of the $50,942,332.00 dividend was to raise the debt and reduce the equity because the Federal Power Commission would not allow pipeline companies to earn on its own equity. The F.P.C. rate of return formula includes the amount of debt with which a pipeline company is saddled. Where there is a higher amount of debt, the F.P.C. would allow a higher rate of return. Parkes further testified that the sole purpose of the "restructuring" was to get a higher rate of return for United Gas Pipeline Co. by the F.P.C., thus allowing UGPC to charge its customers more money for the same product that it had been paying lower prices for before. Parkes' testimony obviously also indicates a clear intention to remove the Louisiana lines from the jurisdiction of the Louisiana Commission and place them under the F.P.C. Parkes' testimony also indicates a clear intention to breach LP & L's contract price.
Thus it is readily apparent that Pennzoil merely "advanced the price to the consumer" by "advanc(ing) prices at will where competition did not exist." There is no price competition because rates are artificially set by various regulatory agencies. Pennzoil merely undertook a market division approach and played the various rate structures against each other. This is not the efficiency sought to be protected by the Sherman Act; it is the type of activity specifically prohibited thereby. Accordingly, under the second criteria of R.S. 51:122 "combination in the form of trust or otherwise... in restraint of trade ..." a violation has occurred and the motion for a directed verdict was erroneously granted.

V CONSPIRACY
Turning to the third type of violation under R.S. 51:122 "conspiracy", on September 6, 1984 by supplemental letter after oral argument counsel for United sought to argue the case of Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) which dealt with the issue whether a parent corporation and its wholly owned subsidiary were legally capable of conspiring with each other under Section 1 of the Sherman Act. That 5-4 decision is extremely limited:
"We do not consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own." (At___, 104 S.Ct. at 2740.)
*1258 The main point of Copperweld is a repudiation of the "intra-enterprise conspiracy doctrine", but not a blanket exemption from antitrust liability where parent and wholly owned subsidiaries are involved:
"Any anticompetive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine. A corporation's initial acquisition of control will always be subject to scrutiny under § 1 of the Sherman Act and § 7 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 18. Thereafter, the enterprise is fully subject to § 2 of the Sherman Act and § 5 of the Federal Trade Commission Act, 38 Stat. 719, 15 U.S.C. § 45. That these statutes are adequate to control dangerous anticompetitive conduct is suggested by the fact that not a single holding of antitrust liability by this Court would today be different in the absence of an intra-enterprise conspiracy doctrine."
(At___, 104 S.Ct. at 2745 Emphasis Added)
The intra-enterprise conspiracy doctrine resulted in different treatment for corporations with unincorporated divisions and parent corporations which incorporated separate divisions. As noted by the Supreme Court, many corporations choose to incorporate divisions for a variety of business reasons, not the least of which is avoidance of taxes.[12]
The main lynchpin of the Copperweld decision, however, is the fact that since the subsidiary is wholly-owned, i.e. the parent is the only shareholder, the interest of the parent and the wholly-owned subsidiary are always the same:
"A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny." (Emphasis added).
The Copperweld decision does not apply to the instant case because there is no federal question or federal jurisdiction involved. (See: City of New Orleans, State of La. v. United Gas Pipeline Co., supra and discussion pertaining thereto.) Even if this case were in federal court, however, Copperweld would not apply because (1) United is not a wholly-owned subsidiary and (2) the interests of Pennzoil and United Gas are adverse and do not present the "unity of interests" required under Copperweld.
While United Gas Pipeline Co. was the wholly-owned subsidiary of United Gas Co. long before Pennzoil entered the scene, the actions discussed herein deal with that period when Pennzoil was a 42% shareholder of United Gas Co., the parent.
The $50 million dollar "refinancing" was obviously not in the best interest of United's 58% shareholders, just as the intentional depletion of gas reserves contravened the interests of its bondholders.
Secondly, it is clear that no "unity of interests" or "common objective" exist. This writer cannot conclude that "financial suicide" by a publicly-owned corporation is any more rational than suicide of a person, as banned by our law. Surely, we cannot be asked to believe that United Gas Company found its own suicide to be beneficial to its interests or objectives.
Even though Copperweld as a federal case does not apply in this state appeal, thus applying the test of Copperweld we find that adverse interests exist. Perhaps it is for this exact reason that the court saw fit to specifically limit Copperweld to cases where 100% stock ownership exists.
*1259 Turning from the issue of corporation-tocorporation conspiracy, we note that the Louisiana Supreme Court has held that a corporation can conspire with its individual members, shareholders and managers. Tooke & Reynolds v. Bastrop Ice & Storage, 172 La. 781, 135 So. 239 (1931); Economy Carpets v. Better Business Bureau, 361 So.2d 234 (App. 1st, 1978), writ denied 362 So.2d 1387 (La., 1978); cert. denied 440 U.S. 915, 99 S.Ct. 1231, 59 L.Ed.2d 464 (1979); Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594 (U.S.C.A. 5th, 1981).
While the writer believes that there may be sufficient evidence to find a conspiracy under Tooke & Reynolds and its progeny, cited above, further discussion of that point is unnecessary, in light of my finding that conspiracy between corporations exists under R.S. 51:122.

VI MONOPOLIZATION
Turning to the next statute, R.S. 51:123 provides as follows:
"No person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state."
Additionally, R.S. 51:124(A) provides:
"A. No person, engaged in commerce shall, in the course of such commerce, lease, sell, or contract for the sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within this state, or fix a price, discount, or rebate on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods, wares, merchandise, machinery, or other commodities of a competitor of the vendor or lessor, where the effect of the sale, contract for sale, or lease, or the condition, agreement, or understanding is to substantially lessen competition or tends to create a monopoly in any line of commerce."
Once Pennzoil acquired United Gas Co. it spun off United's gas exploration and production facilities into several other Pennzoil-owned companies. Once Pennzoil had depleted United of its assets, including its plants and all of its cash, Pennzoil dumped United in another spin-off. As a result, United Gas Pipeline Company is now in the position of being the only major pipeline company in the United States without its own exploration and production facilities.
Ed Parkes testified that another point of the "refinancing" is that United is required to purchase its gas from the Pennzoil Companies. Some corroborating testimony was provided by William Liedtke who stated that Pennzoil's subsidiary has 100% of its production committed to United. Pennzoil has attempted to monopolize the sale of natural gas to United in Louisiana and has violated R.S. 51:123 and 51:124(A) cited above.
Pennzoil's price-fixing of the gas sold to United constitutes a violation of R.S. 51:140 as well, because natural gas is a "product of the soil."

VII STOCK ACQUISITION
R.S. 51:125 provides:
"A. No corporation, engaged in commerce, shall acquire, directly or indirectly, the whole or any part of the shares of another corporation, engaged in the same line of commerce, where the effect of the acquisition:
1) May be to substantially lessen competition between the corporation whose stock is acquire and the corporation making the acquisition:
2) May be to restrain commerce in any section or community; or
3) Tends to create a monopoly in any line of commerce.
B. No corporation shall acquire, directly or indirectly, the whole or any part of the shares of two or more corporations, engaged in the same line of commerce, where the effect of the acquisition, or the use of the shares by voting or granting of proxies, or otherwise:
1) May be to substantially lessen competition between the corporations, or *1260 any of them, whose shares are acquired;
2) May be to restrain commerce in any section or community; or
3) Tends to create a monopoly of any line of commerce.
C. Nothing in this Section shall:
1) Prohibit corporations from purchasing shares solely for investment, and not using them by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition;
2) Prevent a corporation engaged in commerce from causing the formation, holding, owning, and voting shares of subsidiary corporations for the purpose of carrying on their immediate lawful business, or their natural and legitimate branches or extensions, when the effect of the formation is not to substantially lessen competition;
3) Prohibit any common carrier from aiding in the construction of branches or short lines so located as to become feeders to the lines of the company aiding in the construction, or from acquiring or owning all or any part of the shares of the branch lines;
4) Prevent any common carrier from acquiring or owning all or any part of the shares of a branch or short line constructed by an independent company where there is no substantial competition between the company owning the branch line and the company owning the main line acquiring the property or an interest therein; nor
5) Prevent a common carrier from extending any of its lines through the medium of the acquisition of shares, or otherwise, of any other common carrier where there is no substantial competition between the company extending its lines and the company whose shares, property, or interest are acquired."
Pennzoil did not acquire stock in United solely for the purpose of investment, nor did it refrain from voting those shares. Pennzoil, already in the gas exploration, production and pipeline business, substantially lessened the competition between United and itself.

VIII UNFAIR PRICE DISCRIMINATION
R.S. 51:331 provides:
"No person, doing business in Louisiana, and engaged in the production, manufacture, or distribution of any commodity in general use, who shall, intentionally, for the purpose of injuring or destroying the business of a competitor in any locality, discriminate between different sections, communities, cities, or localities in the state by selling such commodity at a lower rate in one section, community, city, or locality, than is charged for the commodity by such person in another section, community, city, or locality, after making due allowance for the difference if any, in the grade or quality of the commodity and in the actual cost of transportation of the commodity from the point of production, if a raw product, or from the point of manufacture, if a manufactured product. All sales so made shall be prima facie evidence of unfair discrimination."
Unfair price discrimination as defined above is the very essence of Pennzoil's actions under the Arthur D. Little study suggestions. As stated in the statute above, the sales themselves are prima facie evidence. Under its companion statute, R.S. 51:333, the contracts or agreements dealing with those sales are void by law. R.S. 51:337 provides that the remedies and penalties in Sub-part A "shall be" cumulative to each other and to all other remedies and penalties provided by law. Thus Pennzoil's actions are subject to penalties under this statute in addition to the treble damages previously discussed.

IX DAMAGES IN ANTITRUST
R.S. 51:137[13] provides treble damages plus attorney's fees and costs:
"Any person who is injured in his business or property by any person by reason *1261 of any act or thing forbidden by this Part may sue in court of competent jurisdiction and shall recover threefold the damages sustained by him, the cost of suit, and a reasonable attorney's fee."
At page 1247, the majority opinion states:
"In December, 1968 Pennzoil was able to cause United Gas Pipeline Co. to pay a dividend of $50,000.00 to it's [sic] new owner. Pennzoil justified this dividend and a subsequent loan by Pennzoil to United as a means of restructuring United's debt-equity ration [sic] in order to obtain more favorable rates from regulatory agencies."
In so stating, the majority has indeed admitted the validity of paragraph # 17 in LP & L's original petition and acknowledge the damages suffered not only by them, but by the rest of the consumers as well. LP & L appears to have suffered certain specific injuries such as construction in addition to the damages suffered by all consumers when the prices artificially inflated by Pennzoil were passed via the fuel adjustment clause to consumers. There are, however, other consumers who have suffered as a result of artificially inflated gas prices, including but not limited to the State of Louisiana, as a consumer, the City of New Orleans, Middle South and its other operating companies as gas purchasers, Orleans Parish, Jefferson Parish, the City of Monroe and other individuals and entities public and private throughout the State serviced by Sterling Station, Nine Mile Point, and other generating stations serviced by the gas pipeline transmission system in Louisiana. These individuals are entitled to treble damages from Pennzoil Co. See: Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).
Accordingly, I would remand to the court below for the purpose of determining the amount of damages suffered by LP & L and other potential intervenors with an order that once the amount of damages be determined in each case, LP & L and other consumers be granted judgment in their favor and against Pennzoil Co. in treble that amount plus legal interest, court costs, and attorney's fees.

*1262 Appendix A
From "Reply Brief on Behalf of Louisiana Power & Light Company" filed January 31, 1984, pages 14 and 15.
Appendix A is provided solely in support of the statement that national business publications published articles dealing with the instant case. None of the substance, implications, or purported factual statements have been read or relied upon by this Court as they are hearsay.

Love Her And Leave Her

That, say the critics, is just what the Liedtke brothers did with United Gas acquiring it, deflowering it, then dumping it.

WHEN PENNZOIL bought United Gas back in 1965, it was a textbook example of a corporate raid. An aggressive Lilliputian captured a sleeping giant. In March, when Pennzoil announced it was spinning off United Gas Pipe Line, a major object of that previous takeover, it was a similar example of a different classic ploy: Take the money and run.
In both cases the winners were Pennzoil's stockholders. And the losers were United's customers. But the real tragic role goes to the Federal Power Commission, whose patchwork regulation of the natural gas industry made it all possible.
The biggest winners of all were Hugh and William Liedtke, brothers with a reputation for smart deals and a flair for finding oil. Over a 15-year span they parlayed their West Texas law practice into control of Pennzoil, a petroleum production and marketing company with 1965 revenues of $86 million.
From there they went after United Gas, basically a utility company that operated, on a volume basis, the nation's largest natural gas pipeline. United also had attractive gas production and mining subsidiaries. The Liedtkes, bought Unitedfive times Pennzoil's sizethrough a tender offer and paid for its stock with $215 million in borrowed money. They ended up with well over $1 billion in revenues and almost $84 million in net earnings last year. And they became multimillionaires along the way.
So far, impressive, but hardly exceptional. Tender offers, conglomeration, deal-makingthe standard games of the Sixties. But the Liedtkes went at it all with an understanding that there is more to business than simply piling size upon size through acquisitions. This year, in fact, the brothers took a major step in the opposite direction. They announced the intention to sell their gas pipeline, reducing Pennzoil's revenues by a full one-half and its net earnings by one-third.
Why the spin-off? Hugh Liedtke explained it to stockholders as being the consequence of proposed legislation that might make it difficult for Pennzoil to sell gas to Uniteda major customeras long as United remained a Pennzoil affiliate.
There may, however, have been more to the deal than that. At least the Federal Power Commission thinks so. It is making a full-scale investigation of the proposed move. What bothers the FPC is a suspicion that United may not be strong enough to stand on its own. The simple fact is that the transaction leaves Pennzoil in possession of some of the juicier assets of the company it acquired.
Among other things, Pennzoil would end up with a good deal of United's cash. Over the past five years, United paid Pennzoil more in dividends than United actually earnedabout $20 million more.
Indirectly, some of this money found its way back into United's treasurybut in a way that benefited Pennzoil's stockholders. In 1973 Pennzoil loaned $31 million to the affiliate. But the loan wasn't in cash; it was a bookkeeping transaction to cover United's share of two Pennzoil offshore gas production projects. Nevertheless, the loan became part of United's rate base. So, in effect, United's customers financed the deal.
On the day before the spinoff was announced, Pennzoil paid itself yet another dividend, this time in the form of $100 million worth of United 9.75% preferred stock. When that is added to United's debt, the company then has an equity capital ratio of only 20%, us. the 35% to 40% that is standard for other pipelines.
Besides this, the preferred stock transaction obliged United to pay Pennzoil almost $18 million a year dividends and the repurchase of the preferred. Last year United earned only $24 million.
In objecting to the spin-off, however, the FPC is on weak ground. It has the authority to approve or disapprove stock issues for electrical utilities, but it has no such power over pipelines. As for the Securities & Exchange Commission, it has no say in the matter at all. The details were fully disclosed in a prospectus.
So, it looks as if the spin-off will prevail and the Liedtkes will have their way. They are used to legal problems. Earlier this year, they agreed to pay $100,000 to former Pennzoil stockholders. The SEC had charged the brothers with violating insider trading rules when they and their private investment company bought Pennzoil shares just before the spin-off was publicly announced. (The two Liedtkes own $8 million worth of Pennzoil stock.) The SEC settlement has done the brothers little real harm so far, but the possibility still remains of Justice Department action in the case. In addition, Pennzoil still faces a suit from holders of its convertible debentures, who are claiming that adjustments should have been *1263 made in the conversion value of their notes, due to the fact that Pennzoil shares are no longer backed by the assets of United Gas.

Out In The Cold
As for the spin-off, it not only leaves United a depleted company, it leaves many of United's customers out in the cold, literally. Most pipeline companies have available gas reserves equal to about ten times their annual needs. But United's reserve/use ratio is only seven times its current yearly demand. On top of this, the FPC projects that United will fall short of meeting its contracts for gas sales by about 40% this winterthe highest rate of any pipeline in the country. As a result, the Commission's curtailment procedures will ration gas among United's customers.
That makes those customers who don't get the gas they've contracted for very mad. But it's nothing new. United curtailed service at the 32% level last year. And some customers have been up in arms for years about the treatment that the pipeline has given them.
When Pennzoil took over United, the company maintained two separate operations. Half its gas was sold through an intrastate system running north through Louisiana, which served industrial customers and utilities in that state. The rest went to a regulated interstate system that snakes along the Gulf Coast from Pensacola, Fla. to Houston, Tex. and delivers gas in bulk to other major distribution pipelines. Among these distributors are Texas Eastern, Texas Gas and Southern Natural Gas.
As a result of vigorous marketing and a growth in the demand for gas, United was soon caughtlike Texas Coastal States (FORBES, Jan. 1with its reserves down. By commingling the gas in its two systems, the company brought its previously nonregulated intrastate operation under FPC jurisdiction. In the process, United got out of some long-term contracts to sell gas for as little as 21 cents per thousand cubic feet in Louisiana. It was able instead to make good on recently sold interstate contracts at the FPC-regulated price, which is now 42 cents.
Mountains of litigation resulted. United spent well over $1 million during the past two years in legal fees alone. Middle South Utilities, United's main Louisiana customer, estimates that it will pass on to its customers nearly $200 million in additional fual costs during 1974 because United couldn't meet its gas contracts. One Louisiana politician, unhappy that Pennzoil moved United's headquarters from Shreveport to Houston, has his own assessment: "We've been raped by our friends."
United's customers sued to get their gas, and the FPCafter Gordon Gooch had become its general counsel (See box)joined the case on United's side. The courts upheld the FPC's power to abrogate contracts by curtailment allocations, letting United off the hook. But some customers are still suing for damages from the company. "We've found that as early as 1968 they were keeping two sets of gas reserves records and taking new business when they didn't have the gas," says John Miller, an attorney for Monsanto and Texasgulf.

Challenge
With its lack of gas reserves and a passel of lawsuits, United clearly represents a challenge for any chief executive. Who would want to take over what is generally acknowledged to be the most troubled company in a severly troubled industry? The Liedtkes chose their cousin, Hugh Roff, formerly a regulatory attorney for American Telephone & Telegraph and a man with no experience in the gas transmission business. To help Roff along, they have him an office six floors above theirs in the building housing Pennzoil's Houston headquarters and sweetened the deal with a ten-year contract at a guaranteed salary of $135,000 annually.
Roff is quick to admit that finding more gas is United's biggest current problem. But doing that won't be easy. For one thing. it's old production unit is being retained by Pennzoil. "We're the only major pipeline without a production or exploration affiliate," he explains.
There is another way to get additional reserves, however By making advance payments, United can buy gas directly from producers. In fact, says Roff, "We're counting on Pennzoil as a major supplier." But there will be a price to be paid" "We'll gladly make gas available to United," explains Bill Liedtke, not too subtly, "provided there's no economic detriment to our shareholder."
But where will United get the cash for those advance paymentseither to Pennzoil or other producers? "Obviously, we wouldn't be in a position to issue more stock," admits Hugh Roff. The outlook for selling bonds is similarly bleak.
Enter once again the FPC, which really can't allow United's system to fail. Too many major trunklines depend on its 8,800mile link, which carries 7% of the nation's gas. So the Commission in effect will be forced to let United earn a return on those advance payments that is sufficient to meet the cost of borrowing to finance them. Just after the spin-off, United filed for a rate increase that asked for a record 17% return on equity. The result, of course, is that the pipeline's customers will pay more for their gas.
The Liedtkes, however, are quick to point out that they've always worked for the best interests of Pennzoil's shareholders. "I think most pipeline people would applaud what we've done if they really understood it," says Bill Liedtke. And he and his brother would enjoy that applauseall the way to the bank.

The Texas Connections
BY SHEER CHANCE, Hugh Liedtke ran into his younger brother Bill on an island in the Pacific. It was near the end of World War II and both men were serving in the Navybut on different ships. The Liedtkes celebrated the occasion with a few drinks and agreed to go to law school together at the University of Texas in Austin after the war.
As students there, they rented rooms in the house of a young congressman. His name was Lyndon Johnson. A fellow tenant was another aspiring lawyer, John Connally.
When Hugh and Bill Liedtke opened a law office in Midland, Tex., they immediately started making oil deals. One of their early partners was George Bush, currently chairman of the Republican National Committee.
The brothers' connection with the South Penn Oil Co. began when Hugh examined a Standard & Poor's "yellow sheet." He liked the company's balance sheet and offered to help it find more oil. Today, the company is Pennzoil, and the Liedtkes run it. Their contacts with men like Johnson, Connally and Bush never did the Liedtkes any harm. Another Texas connection of great value is the prestigious Houston law firm of Baker & Botts, which did $1.1 million worth of work for Pennzoil last year. Baine Kerra B & B partneralso serves as Pennzoil's general counsel at a salary of $198,750. Pennzoil's Washington attorney is another B & B partner, Gordon Gooch. In 1969 Gooch left the firm to serve as top lawyer at the Federal Power Commission. But now he's back heading the Washington office of Baker & Botts and supervising the Liedtkes' dealings with his old employer, the FPC.

*1264 Appendix B

Table of Secondary Sources Consulted
Market Power: Size and Shape Under the Sherman Act by G.E. Hale and Rosemary Hale, Little Brown & Co., Boston & Toronto 1958.
Federal Treble Damage Anti-Trust Actions by E. Compton Timberlake, Callaghan & Co., Mundelein, Ill. 1965
Antitrust Laws, et al v. Unit Operation of Oil or Gas Pools by Robert E. Hardwicke, American Institute of Mining & Metallurgical Engineers, N.Y., N.Y. 1948
Basing-Point Pricing System Under The Federal Antitrust Laws by Geo. H. Sage, Thomas Law Book Co., St. Louis, Mo. 1951
Antitrust And The Consumer (Enforcement) by Morris D. Forkosch, Dennis & Co., Inc., Buffalo, N.Y. 1956
Industrial Concentration and the Market System: Legal, Economic, Social, and Political Perspectives, Ed. by Eleanor M. Fox and James T. Halverson, Section of Antitrust Law, American Bar Assoc. 1979
Ruling Principles of Utility Regulation: Rate of Return by Ellsworth Nichols, Public Utilities Reports, Inc., Washington, D.C. 1955 Vol. II Rate of Return Supplement A by Ellsworth Nichols and Francis X. Welch, Public Utilities Reports, Inc., Washington, D.C. 1964
State Antitrust Laws by James O'Malley Tingle, Section of Antitrust Law, American Bar Assoc. 1974
Bork, "Legislative Intent and the Policy of The Sherman Act" 9 Journal of Law and Economics 7 (1966).
Areeda, "Intraenterprise Conspiracy in Decline", 97 Harvard Law Rev. 451 (1983).
Wolff, "Business Monopolies: Three European Systems In (sic) Their Bearing On American Law", 9 Tul. Law Rev. 325 (1935)
Goodman, "The Revocatory Action", 9 Tul. Law Rev. 422 (1935).
NOTES
[1] See: Handler and Smart, "The Present Status of the Intracorporate Conspiracy Doctrine", 3 Cardozo Law Rev. 23 (1981), for a good discussion of this case law.
[2] A thorough discussion of this doctrine and the problems it fostered can be found in Areeda, "Intraenterprise Conspiracy in Decline", 97 Harvard Law Rev. 451 (1983). See also Willis & Pitofsky, "Antitrust Consequences of Using Corporate Subsidiaries", 43 N.Y.U. Law Rev. (1968) and Note, "Conspiring Entities" Under Sec. 1 of the Sherman Act, 95 Harvard Law Rev. 661 (1982).
[3] See Areeda, supra, at 462-69 for a discussion of how Federal Courts have used these factors to modify the application of the intra-enterprise conspiracy doctrine in pre-Copperweld cases.
[1] The article has been transfered to another section, but no language has been changed.
[2] Federal Treble Damage Anti-Trust Actions, p. 7 fn. 3 (See Table of Secondary Sources attached as Appendix B).
[3] Antitrust And The Consumer, p. 338-347.
[4] The legal fiction is that a corporation exists as a separate legal person. A "corporation" only exists because a state grants it existence by granting it a corporate charter. The state has the power to revoke a domestic corporate charter such that the corporation ceases to exist if it violates state law. In the case of a foreign corporation (i.e. incorporated in another state) the State of Louisiana does not have the power to abolish its existence, but this State can prevent it from doing business in Louisiana.
[5] Antitrust And The Consumer, p. 335.
[6] "Legislative Intent and Policy of the Sherman Act," p. 21-26.
[7] "Legislative Intent," supra p. 21-23.
[8] Senator John Sherman (R. Ohio) is credited with the Act introduced as S.1 in December, 1889 in the 51st Congress and eventually signed by President William Henry Harrison. In addition to Senator Sherman, five other Senators co-authored the bill: George F. Edmunds (R. Vermont), James Z. George (D. Mississippi), George F. Hoar (R. Massachusetts), John J. Ingalls (R. Kansas), William M. Evarts (R. New York). Additionally, Senator Reagan (D. Texas) is credited with the criminal actions and penalties in the Act.
[9] 21 Cong.Rec. 2457 (1890).
[10] 21 Cong.Rec. 2460 (1890).
[11] 21 Cong.Rec. 2460 (1890).
[12] At ___, 104 S.Ct. at 2742.
[13] This dissent will not discuss the possibility of Pennzoil's forfeiture under R.S. 51:139.